UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| Christina McComish, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil No. 1:06cv65 |
| v. | ) | |
| | ) | |
| Underwood Public Schools, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

Christina McComish ("Christina" or "McComish") filed a due process request

challenging her 2005-2006 Individualized Education Plan ("IEP") pursuant to the Individuals

with Disabilities Education Act ("IDEA").  After a hearing held March 6-10, and March 20,

2006, Administrative Law Judge Allen Hoberg ("ALJ Hoberg") concluded that defendant

Underwood Public Schools' ("Underwood" or the "District") proposal to place McComish in the

South Dakota School for the Blind ("SDSB") did not violate her rights to a Free Appropriate

Public Education ("FAPE") in the Least Restrictive Environment ("LRE") available, and the

District need not provide compensatory education.

McComish appealed the ALJ's findings.  The parties have filed cross motions for

summary judgment.  The court granted plaintiff's request for hearing and permitted supplemental

briefing.  For the reasons that follow, McComish's Motion for Summary Judgment is **DENIED**

and Underwood's Motion for Summary Judgment is **GRANTED**.  The ALJ's decision is

affirmed and this action is dismissed.

**<u>Factual and Procedural Background</u>**

Christina McComish became eligible for services under IDEA in 1995 when the removal of a brain tumor and a subsequent stroke left her with a significant visual impairment and partial paralysis on her left side. <u>Testimony of Sarita McComish</u>, Tr. at 799-800.  She was seven years old at the time and attending the second grade at Underwood Elementary School.  After her recovery, she returned to the Underwood School through her fifth grade.  The District provided Christina with educational services within the District under yearly IEP plans. <u>Administrative Hearing Exhibit 19 (hereafter "Exhibit")</u>.  In July 1998, plaintiff's IEP team met "to evaluate Christina's needs and to discuss placement for the 98/99 school year." <u>Exhibit 20</u>.   At that time the IEP team members determined that Underwood could not meet Christina's educational needs and they explored other alternatives. <u>Id.</u>  The team determined the most appropriate placement was the South Dakota School for the Blind ("SDSB"), particularly in light of SDSB's ability to train Christina in Braille. <u>Id.</u>  Christina remained at SDSB for the next four school years pursuant to approved IEP plans.  In 2002, Christina's parents, Bruce and Sarita McComish ("Bruce" and "Sarita"), requested the District accommodate Christina's return to Underwood to attend high school. <u>Exhibit 21</u>.  The District arranged for Holly Kersten, a Tutor in Training who wished to obtain her certification in low vision teaching, to serve as Christina's low vision instructor and case manager. <u>Id.</u>  Christina returned to the District and commenced ninth grade at Underwood High School.  After two years of this arrangement, the District granted Ms. Kersten's request for release from her contract. <u>Testimony of Ralph Charley</u>, Tr. at 53-54.  Despite a statewide and regional search to replace her, <u>exhibit 22</u>, the District was unable to secure a low vision teacher before the start of the 2004-2005 school year.  On August 23, 2004,

2

the District convened an IEP meeting to discuss "options for providing educational service for Christina McComish for the 2004-05 school year." Id.  The IEP team discussed several placement options, including Grand Forks, Fargo and Minot.  Id.  Gene Utecht ("Utecht"), the Principal of the Underwood High School, suggested placing Christina in the Minot Public Schools would result in the LRE (Least Restrictive Environment). Id.  Bruce and Sarita agreed to the Minot placement "under protest."  Id.  The District agreed to continue efforts to locate a low vision instructor, and if the efforts were successful, Christina would return to the District.  Id. Shortly thereafter Christina's parents submitted a doctor's opinion that the daily travel to and from Minot would place unacceptable physical demands on Christina. Exhibit 50.  Thus, the Minot placement was abandoned.

The next IEP meeting was held on September 13, 2004.  Exhibit 23.  Despite the District's inability to secure a low vision instructor, the McComish family insisted on in-district placement.  The IEP team reluctantly agreed to this placement, Testimony of Ralph Charley, Tr. at 59, and immediately set about arranging personnel and programs to attempt to meet Christina's needs.  The District provided Christina with several pieces of assistive technology, hired Linda Johannes as a paraprofessional Special Education Aide, provided North Dakota School for the Blind ("NDSB") outreach services by two certified vision impaired teachers traveling, once per week, to Underwood, and arranged for Christina to attend an Expanded Core Curriculum training course for five weeks (one week at a time) at NDSB.  Exhibit 27.

The District held ten IEP meetings over the course of the year to address concerns and to follow Christina's progress.  The IEP team implemented several revisions throughout the year to the 2004-2005 IEP.  Exhibit 27.  Despite these efforts, the IEP team members observed that

Christina clearly suffered both academically and personally during the 2004-2005 school year. Her grades deteriorated and evaluations of her daily living skills showed her skills were well below the level of her peers.  Exhibit 41.

The IEP team convened on September 1, 2005 to discuss Christina's IEP for the 2005-2006 school year.  Exhibit 31.  Recognizing the serious shortcomings of the existing IEP, team members acknowledged that they needed to make significant changes to Christina's IEP for 2005-2006.  Exhibit 31.  The McComish family attributed most of the problems to the District's failure to provide Christina with her assignments in advance and its refusal to supply the adaptive technology requested by the family, particularly the BrailleNote.  Other team members expressed concern with the lack of transitional skills training for Christina.  The IEP meeting continued with a discussion of goals and objectives, and eventually turned to the issue of placement.  At that time Christina and her parents left the room.  Christina eventually returned to the meeting and indicated she wanted to "stay put."  Ralph Charley advised Christina a "stay put" would not go into effect unless she filed a due process request.  Christina and her parents again left, and the meeting continued in their absence.  The team finalized Christina's IEP, with the exception of placement.  Exhibit 32.  The meeting was rescheduled for October 5, 2005, but postponed at Sarita's request, who stated a desire to obtain a  written report from Dr. Blohm, Christina's therapist, concerning "the potential ramifications and damages that an out of district placement might have on Christina's emotional health."  Exhibit 46.  The District never received a letter from Dr. Blohm.

A second IEP meeting was convened on October 12, 2005.  Exhibit 32.  This meeting continued the discussion from the September 1, 2005 meeting "to complete the decision of

placement." Id.  Prior to the meeting the team members received a list of program options in

North Dakota.  Id. The list identified Underwood as the first option.  Principal Utecht strongly

voiced his concern that without a certified low vision teacher "the school district cannot

appropriately meet Christina's educational needs." Id.  Other team members concurred.  Id.

Discussion continued regarding the barriers and limitations existing under the 2004-2005 IEP.

Id.  Linda Johannes expressed concern that she was "not capable of preparing [Christina's]

English, Math and academics," that Christina would not "always use the adaptations she

prepares," and that Ms. Johannes felt restricted by her own education.  Id.  The team discussed

these concerns, plus the fact that the other teachers carried full loads and lacked training for the

issues presented by low vision instruction, and the representatives from the NDSB were not

present to help on a daily basis.  Id.  Thus, the team concluded that "Underwood cannot educate

Christina appropriately without a certified teacher." Id.  Additionally, the IEP team members

found that placing Christina in the resource room at Underwood could present "potential harmful

effect to the student." Exhibit 33.   The IEP stated:

> The Underwood School District has attempted without success to hire a
> teacher certified in visually impaired.  Outreach teachers provide support but are
> only available on-site one day per week.  An Education Aide attempts to carry out
> all of the adaptations and offer support to Christina throughout the day.  However,
> there are no staff certified in Orientation and Mobility in Underwood, no qualified
> Technology staff needed to carry out the program and no staff trained in
> Transition Services for the visually impaired.  At times, educational problems
> arise and cannot be responded to in a timely manner.

Exhibit 33.

Ralph Charley, a representative of Souris Valley Special Services, advised the team of

placement options and their availability.  Id. Mr. Charley advised Dickinson, Bismarck, Minot,

Fargo and Grand Forks had no openings for visually impaired students, the last due to lack of

housing opportunities.  Id.  When the team raised state school options, the McComishes immediately voiced their objection.  Id.  Mr. Charley advised Christina of her right to request a due process hearing "if she does not agree with the decision to attend School for the Blind in Aberdeen [South Dakota]...."  Id.  A discussion of the benefits and drawbacks of SDSB ensued, with Dianne Giessinger from the NDSB extolling its virtues, stating, "Aberdeen provided a core curriculum and foundation and a strong foundation is needed in order to move forward in education."  Id.  The team decided Christina should start at SDSB on October 24, 2005, and they would address the specifics, such as transportation and visitation, in a revised IEP.  Id.

On October 24, 2005, Christina filed a request for due process with the Department of Public Instruction ("DPI").  Rather than attend SDSB, she invoked a "stay put," requesting continuation of her 2004-2005 IEP.  The District opposed the "stay put" placement, believing that placement in Underwood was inappropriate.  The Office of Administrative Hearings appointed ALJ Hoberg to preside over the due process hearing.  By prehearing order dated November 14, 2005, ALJ Hoberg ordered a "stay put" under the 2004-2005 IEP, "unless counsel for the parties agreed in writing to changes in that IEP."  Findings of Fact, Conclusions of Law, and Order, Doc. 1-3, at 10.  Additionally, ALJ Hoberg sought clarification of the issues and on December 12, 2005 issued a Prehearing Order, Notice of Hearing and Specification of Issues. The order identified two issues:

> 1) Whether the proposed placement by the Underwood Public Schools of Christina McComish at the South Dakota School for the Blind in Aberdeen, South Dakota, for the 2005-2006 school year, fails to meet the IDEA requirements to provide a free appropriate education for Christian [sic] McComish in the least restrictive environment.
> 2) Whether under IDEA, as a result of the proposed placement by Underwood Public Schools, Christina McComish must be provided compensatory education by the Underwood Public Schools.

Doc. 30.  On May 11, 2006, after a lengthy hearing and receipt of voluminous exhibits, ALJ

Hoberg issued an order finding that Christina's placement at the South Dakota School for the

Blind satisfied the District's requirements under the IDEA to provide a free appropriate

education in the least restrictive environment.  ALJ Hoberg concluded:

> The greater weight of the evidence shows that the Underwood Public Schools'
> proposed placement of Christina McComish at the South Dakota School for the
> Blind in Aberdeen, South Dakota, meets the IDEA requirements to provide a free
> appropriate education for her in the least restrictive environment.  Christina
> McComish had the burden to show otherwise and she did not.  Further, the greater
> weight of the evidence also shows that Christina McComish is not entitled to be
> provided compensatory education by Underwood Public Schools as a result of its
> proposed placement at the South Dakota School for the Blind because this
> proposed placement was appropriate and Christina McComish should not be
> rewarded for challenging that placement.  The due process hearing was initiated
> by the McComish family and the stay put was specifically requested by Christina
> through counsel.  Their actions have resulted in Christina essentially being
> educated in the Underwood Public Schools for two years under the 2004-2005
> IEP when, arguably, she should not have been educated there at all in 2004-2006.

Findings of Fact, Conclusions of Law, and Order, Doc. 1-3, at 18.

> In reaching this conclusion, ALJ Hoberg made several findings of fact relative to FAPE:

> The testimony of all the educational professionals and paraprofessionals working
> with Christina during the 2004-2005 and 2005-2006 school years was generally to
> the effect that, primarily, because she did not have on a daily basis the services of
> a vision impaired teacher, Christina's education at the high School was not
> adequate to her needs, i.e., her academic needs were not met without a full-time
> teacher of the vision impaired in the District, and, correspondingly, Christina's
> academic performance in high school suffered.  The testimony of the remainder of
> the witnesses, including Christina and Sarita, was not really contrary.  The
> evidence shows, by the greater weight of the evidence, that Christina's placement
> at the High School under the 2004-2005 IEP was not adequate to provide a free
> appropriate public education ("FAPE") for Christina as to her academic needs.
> Indeed, without a full-time teacher of the vision impaired in the District, it
> appears not to be possible to provide for Christina's needs at the High School.
> The District has attempted without success to hire a certified vision impaired
> teacher;  outreach teachers from Grand Forks (NDSB) provide support but are
> only available on-site one day per week;  an education aide attempts as best she

7

can, but inadequately, to carry out all of the adaptations Christina needs and offer support to Christina; there is no staff certified in orientation and mobility in the District; there is no qualified technology staff in the District needed to carry out Christina's program; and there is no staff trained in transition services for the visually impaired in the District.

Id. at 9.  ALJ Hoberg further found "[t]he 2004-2005 IEP for Christina for her education in regard to extended core curricular needs is not adequate to provide FAPE for Christina in the High School."  Id. at 9-10.  ALJ Hoberg found "[i]n total, the evidence does not show that the District can provide FAPE to Christina without a teacher of the vision impaired for Christina in the District."  Id. at 10.

Recognizing the inability of the District to provide FAPE and having the benefit of hindsight, ALJ Hoberg opined,  "The past several months of school year 2005-2006 have reinforced and magnified the need for a change of placement for Christina, arguably the residential placement at the SDSB in the proposed IEP for the 2005-2006 school year."  Id. at 11. Finally, finding "all of the six in-state options were discussed, but none of them were available" on October 12, 2005, ALJ Hoberg held that "[c]ertainly, as compared to the District and Christina attending at the High School, the SDSB is the least restrictive environment that can appropriately educate Christina."  Id. at 11-12. ALJ Hoberg concluded that Christina failed to show her placement at the SDSB was not FAPE in the LRE, id. at 16, and therefore "it is not appropriate to award Christina compensatory education as a result of the District's proposed placement decision," since "there can only be an award of compensatory education when there has been a denial of FAPE."  Id. at 17.

### IDEA Generally

The Individuals with Disabilities Education Act is designed to help states meet the educational needs of children with disabilities, and it establishes an enforceable right to a "free appropriate public education." Briere v. Fair Haven Grade School District, 948 F. Supp. 1242, 1249 (D. Vt. 1996) (citing Mrs. W. v. Tirozzi, 832 F.2d 748, 750 (2d Cir. 1987)). IDEA requires teams consisting of parents, teachers, and representatives of local education agencies to develop Individualized Education Programs (IEPs) for students with disabilities. The team must follow procedural requirements, including providing notice of hearings, decisions, and annual reviews, in drafting and implementing the IEPs. Id. The IEP must identify the educational level of the student and include a statement of educational goals and objectives for the student and the extent to which the student can participate in the regular educational program. Id.

Under the IDEA, schools must educate handicapped and non-handicapped children together "to the maximum extent appropriate" and provide special education in "the least restrictive environment." Roland v. Concord School Committee, 910 F.2d 983, 987 (1st Cir. 1990). "The Supreme Court has concluded that compliance with IDEA requires 'specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child.'" Briere, 948 F. Supp. at 1252 (quoting Bd. of Ed. of the Hendrick Hudson School District, Westchester County v. Rowley, 458 U.S. 176, 201 (1982)). The school must provide education "sufficient to confer some educational benefit upon the handicapped child." Id. "It is not necessary that the state provide the best possible education for all students, but merely an education which is likely to produce meaningful progress." Id. (citing Board of Educ. v. Diamond, 808 F.2d 987, 991 (3d Cir. 1986)).

## **Standard of Review Under IDEA**

The court does not "apply the traditional summary judgment standard of review" in an IDEA action.  Kevin T. v. Elmhurst Community School Dist. No. 205, 2002 WL 433061, at 3 (N.D. Ill) (citing Morton Community Unit sch. Dist. No. 709 v. J.M., 152 F.3d 583, 587-88 (7th Cir. 1998)).  Rather, the IDEA dictates that the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines appropriate.  Id.

The party challenging the administrative decision bears the burden of proof.  Id. (citing Heather S. v. Wisconsin, 125 F.3d 1045, 1052 (7th Cir. 1997)).  Courts give "due weight" to the results of the administrative proceedings, id., and may not "'substitute [their] notions of sound educational policy for those of the school authorities which they review.'"  Id. at 3 (quoting Rowley, 458 U.S. at 206).  However, affording "due weight" does not require deference "to the testimony of witnesses or to the evidence--both of which the court must independently evaluate--but to the decisions of the hearing officers.'"  Id. (quoting Heather S., 125 F.3d at 1053).  Giving "some sort of deference" to the administrative decision,  id., implies "the court should not 'reverse the hearing officer's decision simply because [the court] disagrees with the decision.'"  Id. (quoting Bd. of Ed. of Arlington Heights Sch. Dist. No. 25 v. Illinois State Bd. of Educ., 2001 WL 585149, at *4 (N.D. Ill. March 19, 2001)).

"Due weight, however, does not mean 'abdication of all judicial function.'"  Id. (quoting Nein v. Greater Clark County Sch. Corp., 95 F. Supp. 2d 961, 965 (S.D. Ind. 2000)).  "More deference is afforded when the administrative decision is 'thorough and complete.'"  Id.  (citing

Adams v. State of Oregon, 195 F.3d 1141, 1145 (9th Cir. 1999)).  The court is permitted to "take

an independent and critical look at the evidence."  Id. (quoting Nein, 95 F.Supp.2d at 965)).

## Analysis of IDEA Claim

Christina contends the District violated the IDEA in a myriad of ways: the District failed

to implement significant provisions of her 2004-2005 IEP;  the technology chosen by the District

was inadequate to improve her performance; the physical facility was not fully handicapped

accessible; the District did not implement a proper English program; Underwood provided no

transitional skills; Christina did not receive her homework assignments in a timely manner; and

the District improperly segregated from her peers.  Christina further argues that the District's

proposal to place her at SDSB fails to meet IDEA requirements of FAPE in the LRE because the

academics at SDSB are not commensurate with her capabilities and the other students at SDSB

are not her "peers."  Despite the shortcomings of the 2004-2005 IEP, Christina argues that

Underwood is the LRE for her to finish her education.  Consequently,  Christina argues that

Underwood's refusal to continue the admittedly inappropriate placement in Underwood without

the assistance of a low vision instructor entitles Christina to compensatory education. This

argument is inconsistent and must ultimately fail.

Plaintiff in effect argues the 2004-2005 IEP, and hence the "stay put" 2005-2006 IEP is

not FAPE, did not offer her FAPE, and that Underwood, not SDSB, was LRE.  The District

contends plaintiff's argument support the District's position that "Underwood was not the proper

placement for the plaintiff because it could not provide her with all of her educational needs."

Defendant's Consolidated Memorandum in Response to Plaintiff's Motion for Summary

Judgment and Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment,

Doc. 56, at 1.  However, plaintiff does not concede the District was <u>unable</u> to provide FAPE at

Underwood; she argues only it failed to do so.  Plaintiff claims the District could have provided

FAPE in 2005-2006 through specific modifications to the 2004-2005 IEP.  In essence, plaintiff

contends a low vision instructor was not necessary to achieve FAPE.

Although plaintiff's claim does not directly challenge the 2004-2005 IEP, that IEP

illustrates the essential difference between the parties' positions:  Whether the District was

unable to provide FAPE at Underwood in 2005-2006, or whether it was able, but failed to do so.

Reviewing each of Christina's arguments, and the District's concerns, results in only one

conclusion: The District could not provide FAPE to Christina in Underwood without the

employment of a low vision instructor.

### 1.    <u>Appropriate Technology</u>

Christina contends the technology chosen by the District was inadequate for her to

improve her performance, "keep up with full-sighted peers, and make academic progress

commensurate with her abilities."  <u>Plaintiff's Memorandum in Support of Motion for Summary</u>

<u>Judgment</u>, Doc. 54, at 16.  Sarita testified that Christina experienced considerable problems with

the Braille Lite, preventing her from excelling academically:

> Q:  Okay.  And was -- were there problems with this Braille Lite?
> A:  There have been problems with the Braille Lite machine since
> it was brought to the school in January 2003.
> Q:  What did you do when you had a problem with the Braille
> Lite?
> . . .
> A:  The Braille Lite, even in 2004, has had numerous problems.
> Q:  And did that lead you to discuss with the IEP team members
> and others about trying something else?
> A:  We were originally trying to find training for Christina on the
> Braille Lite machine.  They kept saying that she needs to have
> more training, she needs to be more proficient, she needs to

> become the Braille Lite queen.  It's just – they kept insinuating
> that she needs to learn more about this machine.

Testimony of Sarita McComish, Tr. at 895.

Christina's parents ultimately purchased a Braille Note, the equipment they argue she needed to succeed academically.  Plaintiff argues the District's failure to implement this portion of her 2004-2005 IEP resulted in the denial of FAPE, separate and apart from lack of a low vision instructor.

The team repeatedly discussed the use of adaptive technology at Christina's IEP meetings.  Dianne Giessinger testified that the Braille Note would not help plaintiff's auditory processing or Braille reading speed, "not even by one word per minute."  Testimony of Dianne Giessinger, Tr. at 347.  Christina could read Braille at approximately 50 words per minute.

Testimony of Dianne Giessinger, Tr. at 346.  To succeed at her stated goal of attending college to become a Braille instructor, Christina would need to read at 200-250 words per minute.

Exhibit 83.

Linda Johannes testified that although there were some problems with the Braille Lite provided by the District, the problems were not insurmountable:

> Q:  Okay.  Have you been using the Braille Lite with Christina?
> A:  I don't use it except for helping her print off materials, off the Braille Lite.
> Q:  Okay.  How has that been working?
> A:  I feel it worked fine.

Testimony of Linda Johannes, Tr. at 1077.

Nothing in the record suggests that if the District had secured the Braille Note, Underwood would then have been able to provide Christina FAPE in 2005-2006.

2.      **Timeliness of Assignments**

Christina argues that "her struggles were made more difficult because her instructors

routinely failed to give [her] her homework assignments a week in advance as recommended by

Dr. Joe Miller and entered as part of her IEP."   Plaintiff's Memorandum in Support of Motion

for Summary Judgment, Doc. 54, at 14.  Sarita testified as follows:

> Q:  Have there been recommendations as to how far in advance Christina should
> receive her assignments:
> A:  The meeting that we've attended, the vision people recommend a week.
> Q:  Have all teachers provided their assignments a week in advance to Christina?
> A:  No.
> . . .
> Q:  What's wrong with Christina getting an assignment, let's say, the day of the
> assignment or a day before the assignment?
> A:  Christina reads Braille at 55 words a minute, which is considerably less than I
> think most 11th graders would read print.  So it takes her longer to read a set of
> questions or do an assignment than it does the sighted student.

Testimony of  Sarita McComish, Tr. at 852.  Sarita's testimony infers Christina's Braille reading

speed prompted the recommendation for advance homework assignments.  However,

Recommendation 13 in Christina's 2004-2005 IEP states that Christina's teachers should provide

the assignments at least a week early "to provide for adequate time to make the appropriate

visual modifications."   Exhibit 36.  Christina's teachers did give Linda Johannes the assignments

before providing them to the other students so Ms. Johannes could adapt them for Christina.  Ms.

Johannes testified:

> Q:  When do you receive assignments from teachers?
> A:  Usually – this year and last year, I would get things at the beginning of the
> week and I prepare them, I give them back to the teacher, and she hands them to
> Christina when she hands the other assignments out for the other students.
> Q:  So does Christina get her assignments in Braille or in large type at the same
> time the other students get theirs?
> A:  To the best of my ability.  There may be times that – very rare—that they'll
> have something else, and I do it as soon as I can and I give it to her.  But I do it as

much as – I mean, it's usually done ahead of time.

. . .

Q:  Teachers give you the assignments and then you adapt them as quickly as you can and you give them to Christina?

A:  No.  I give them back to the teacher, so the teacher hands them to her when they give out the assignment to the class.

. . .

A:  From what I know from what the teacher will tell – because I will ask the teacher, "Now, when do you need this?" And he'll say, you know, "I'll need it today, I'll need this for Thursday, I'll need this for Friday."  They give me the week's assignments, they give me the tests ahead of time."

They're – as far as I know, she gets the assignments the same day the other kids do, because that's how the classroom works, from what I've been able to observe.

Testimony of Linda Johannes, Tr. at 1074-77.  The greater weight of the evidence shows the

advance assignment provision was intended to afford sufficient time for adaptation of the

assignments, not to give Christina more time to work on the assignments.  Contrary to

Christina's argument, the evidence shows the District complied with this particular provision of

her 2004-2005 IEP.

**3.      Transitional Skills Training**

Plaintiff argues that the District's failure to provide her transition skills training at

Underwood violates the IDEA.  Plaintiff's Memorandum in Support of Motion for Summary

Judgment, Doc. 54, at 13.  The District recognized this problem with Christina's 2004-2005 IEP

and attempted to remedy the situation through placement at SDSB.  Ralph Charley testified in

this regard:  "We did not provide a lot of transition.  That was one of the problems we were

having.  We didn't have the capability to provide a lot of transition there."  Testimony of Ralph

Charley, Tr. at 81.  The District attempted to address this inadequacy by providing in Christina's

2004-2005 IEP for a five week placement in the Compensatory Skills Training program at the

North Dakota School for the Blind in Grand Forks.  Exhibit 36.  Christina did not fully

participate in the Compensatory Skills Training under the 2005-2006 "stay put" IEP.  Ralph

Charley testified, "There have been four weeks of compensatory skills programming this year.

Christina has attended one week.  And that week, we had not heard anything from Christina."

Testimony of Ralph Charley, Tr. at 132.   Underwood suggests its concern about transitional

skills training, particularly the lack of follow-up in Christina's home, contributed significantly to

the identification of SDSB as the most appropriate placement option.  Mary Bormann's

testimony highlighted Christina's deficiencies in this area:

> Q:  With reference to the evaluations of the expanded core curriculum areas, can
> you tell me if you noted significant delays of where Christina was?
> A:  In terms of expanded core curriculum, one of the things that I remember being
> so significant were the independent living skills area.  And I believe there were 12
> sub tests in that area.  And Christina scored at 50 percent or below in 7 out of
> those 12 areas.  And that was significant.

Testimony of Mary Bormann, Tr. at 149.

The IDEA requires that the student's IEP contain a statement of transition service needs

of the child.  Kevin T. v. Elmhurst Community School Dist. No. 205, 2002 WL 433061 *12 (N.

D. Ill).  Transition service is an activity for a disabled student that:

> (A)  is designed within an outcome-orientated process, which promotes movement from
>      school to post-school activities, including post-secondary education, vocational
>      training, integrated employment (including supported employment), continuing and
>      adult education, adult services, independent living, or community participation;
> (B)   is based upon the individual student's needs, taking into account the student's
>      preferences and interests; and
> (C)  includes instruction, related services, community experiences, the development of
>      employment and other post-school adult living objectives, and, when appropriate,
>      acquisition of daily living skills and functional vocational evaluation.

20 U.S.C. §1401 (30) (1987).  Addressing this issue, ALJ Hoberg recognized SDSB's advantage

over Underwood in providing the necessary programming, stating:

> At the SDSB Christina would have multiple teachers of the vision impaired on

site for her academic needs and <u>a full-time, seamless extended core curriculum,</u>
<u>also using teachers of the vision impaired and employing daily follow-up in</u>
<u>independent living skills, orientation and mobility, personal hygiene,</u>
<u>transitioning, and vocational interests, including on-the-job experiences.</u>

<u>Findings of Fact, Conclusions of Law, and Order</u>, Doc. 1-3, at 12 (emphasis added).  ALJ

Hoberg concluded:  "Certainly, as compared to the District and Christina attending at the High

School, the SDSB is the least restrictive environment that can appropriately educate Christina."

<u>Id.</u>

The record is replete with evidence that SDSB would provide the Core Curriculum that

Christina's 2004-2005 IEP lacked.  Therefore, the court finds that residential placement at SDSB

would accomplish FAPE in transitional services, which placement at Underwood could not.

**4.      Attempts to Locate Vision Impaired Teacher**

The release of Holly Kersten from her contract left the District without a low vision

instructor.  Despite significant efforts to secure a replacement in 2004, the District was

unsuccessful.  Superintendent Dale Ekstrom testified about those efforts:

> Q:  Okay.  Now you can tell me the specifics that you were aware of, what was
> going on in regard to obtaining either a teacher for tutor in training or a vision
> impaired teacher.
> A:  Okay.  Yeah, immediately after that release, the position was listed on the Job
> Service web site, which obviously is the common web site for people in the
> region.  I also believe that we had contacted Souris Valley special ed co-op to
> make sure that they were aware of the situation and that we needed a teacher in
> either category, for certified visually impaired or a teacher with tutor in training.
> I believe there were also some contacts made by – by Mr. Utecht and possibly
> others to other school districts to see if there were possibilities.

<u>Testimony of Dale Ekstrom</u>, Tr. at 1039.

ALJ Hoberg held that the District could not provide Christina FAPE in the District

without a low vision instructor.   <u>Findings of Fact, Conclusions of Law, and Order</u>, Doc. 1-3, at

110.  Overwhelming evidence supports this finding. As argued by the District, continuing to educate Christina in the District without providing FAPE simply because it is the LRE would run contrary to the mandate of the IDEA.  Instead of limiting itself to that inappropriate choice, the District turned its attention to securing FAPE in the LRE, outside of Underwood.

### 5.      Placement Options for 2005-2006 IEP

The IEP team did not consider a residential placement as the first alternative.  Ralph Charley's testimony illustrates the placement options the team considered:

> Q: And would you brief – did you have any role in presenting this list of exhibits—or this list of options?
> A: Yes.  The – principal at – Mr. Utecht and I worked together on this.
> Q:  And would you summarize what each of these options were and whether they were available at the meeting on October 12th of 20056?
> A:  Okay.  Of course, the first least restrictive environment would have been Underwood.  And the district was saying it wasn't appropriate because we didn't have a teacher.
> We next looked – just started looking at closer places.  As you can see, Dickinson does have a teacher of the visually-impaired.  They did not have room. The same with Bismarck.
> Minot, we did have room up until the first of September when a new student moved in, so there was no longer room there.  Fargo had room earlier in the year when we looked at it, but that had been filled. Grand Forks still had a placement for her in their visually-impaired program, but there wasn't any housing available at the time for Christina in Grand Forks.
> Q:  Grand Forks does not provide a residential program?
> A: This was not with the School for the Blind.  The placement she would have had in Grand Forks was at the Grand Forks Public School System.
> Q:  Okay.  So what options did you next – were those all of the in-state options that you believed had potential as a placement for Christina?
> A:  Right.  Yes, it is.
> Q:  So then what did you do?
> A:  So then we started, of course, looking out of state.  And we looked at Aberdeen and Great Falls, Montana.

Testimony of Ralph Charley, Tr. at 72-74.

The District examined alternative non-residential placements and concluded none were

available.  Thus, the District turned its attention to residential placements. The South Dakota

School for the Blind was raised as the logical residential placement due to Christina's previous

experience there and its close proximity to her home.  Christina challenges the SDSB placement

by arguing it is neither FAPE nor LRE.  In particular, she complains that placement at SDSB

would segregate her from her non-visually impaired peers.

Although IDEA requires "mainstreaming" to the maximum extent appropriate, the court

must first inquire whether the proposed segregated placement is appropriate under the Act.

Roncker v. Walter, 700 F.2d 1058, 1063 (6th Cir. 1982).   "In a case where the segregated facility

is considered superior, the court should determine whether the services which make the

placement superior could be feasibly provided in a non-segregated setting."  Id.   If they can, the

placement in the segregated school would be inappropriate under the Act.

Clearly IDEA contains a strong preference in favor of mainstreaming.  However, there

are circumstances in which

> Some handicapped children simply must be educated in segregated facilities
> either because the handicapped child would not benefit from mainstreaming,
> because any marginal benefits received from mainstreaming are far outweighed
> by the benefits gained from services which could not feasibly be provided in the
> non-segregated setting, or because the handicapped child is a disruptive force in
> the non-segregated setting.

Roncker, 700 F.2d at 1063 (citing Age v. Bullitt County Schools, 673 F.2d 141,145 (6th Cir.

1982)).  See also A.W. v. Northwest R-1 School District, 813 F.2d 158, 162 (8th Cir. 1987) ("For

our present purposes, the most important provision of the Act is section 1412(5), which provides

that 'to the maximum extent appropriate, handicapped children *** are to be educated with

children who are not handicapped, and that *** removal of handicapped children from the

regular educational environment [should occur] only when the nature or severity of the handicap

is such that education in regular classes with use of supplementary aids and services cannot be

achieved satisfactorily.").

This court must determine whether or not the District could meet Christina's

"educational, physical or emotional needs" in Underwood.  See Roncker, 700 F.2d at 1063.  ALJ

Hoberg's findings provide guidance and are entitled to due weight.  Id.  ALJ Hoberg made the

following finding regarding the proposed segregated placement in Christina's 2005-2006 IEP:

> In this matter, Christina has not shown that her placement at the High School in
> the District is appropriate.  Put another way, she has not shown that her proposed
> placement in the SDSB is not appropriate as compared to her placement in the
> High School under the 2004-2005 IEP, or otherwise.  There were no other viable
> options to consider at the time the District issued its prior written notice to
> Christina proposing the SDSB.  The evidence is really overwhelming that the
> High School is not currently an appropriate placement for Christina, either
> academically or with reference to the expanded core curriculum.  The evidence
> shows that, based on Christina's needs, the SDSB is an appropriate placement
> with reference to both her academic and core curriculum needs.  Moreover,
> because location of placement seems to be a priority with the McComish family,
> the location of the SDSB as a residential placement, a distance not far from their
> home, is reasonable, in relative terms.

Findings of Fact, Conclusions of Law, and Order, Doc. 1-3, at 16.   Substantial evidence

supports this finding.

During the October 12, 2005 IEP meeting, Bruce raised his concern that the curriculum at

SDSB fell well beneath Christina's grade level.  Dianne Giessinger responded to his concerns:

> Q:  On page 111 of the materials, it's noted in the minutes that Mr. McComish
> stated he wanted a progress report about Aberdeen's regular curriculum and the
> likelihood that Christina would be a Braille teacher.  Was that responded to by
> others in your presence at that IEP meeting?
> A:  Yes.  Dianne Giessinger, who's employed by the School for the Blind in
> Grand Forks, responded to it.
> . . .
> Q:  Do you recall, in general terms, the tenure [sic] of her presentation about the
> school at Aberdeen?
> A: Well, she, in being a teacher of the visually-impaired, what have you, felt that

the academic portion of their program was excellent, they were fully accredited, and they helped students, not only in an academic way, but they were in the residential program and they got the benefit of daily living and, you know, all of those things that go along with making a person productive on their completion of high school.

Q:  That was all discussed in Christina's presence on the 12th of October of 2005?

A:  That's right.

Testimony of Ralph Charley, Tr. at 135-36.  During the course of the administrative hearing several IEP team members voiced their opinion that the SDSB placement would ensure an appropriate education for Christina.  For example, Dianne Giessinger testified:

Q:  As a member of Christina's IEP team, did you concur with the proposed IEP placement at the School for the Blind in Aberdeen, South Dakota?

A:  Yes, I did.

Q:  Why?

A:  I did because the opportunity that we just discussed is a lot more available there.  For one thing, her social skills, you've got peers to go and do something with in the evenings so that you can learn friendship skills.

You have a bigger city where you can learn how to use orientation, mobility skills.  There's more jobs available in terms of job-shadowing right within the community.

Those independent living skills are integrated right into your day.  As you're living in the dorm, you're doing them in that meaningful setting that I was talking about.  It's – in a resident setting, it's – these transition skills are easier to be addressed.  Not only are they – they're addressed then also by teachers that are all vision – vision teachers.

In terms of academics, she'd have all vision teachers that know the appropriate – know the subject matter as well as the vision issues that go with the subject matter.  And then you also have experts to teach the core curriculum that we discussed this morning.

So it's an excellent option, especially given the extreme need for the transition skills, given Christina's going to be 19 this July.  That's less than six months from now.  That needs to happen now, not until – not until after she gets her diploma and then start working on them.  They need to be worked on right now.

Testimony of Dianne Giessinger, Tr. at 392-93.  Additionally, Mary Bormann, Christina's case manager, opined that SDSB's certified academic curriculum and "on-site" core curriculum training would provide Christina opportunities not otherwise available to her:

> Q:  Do you concur in the determination that the proper placement for Christina is in South Dakota?
> A:  Absolutely.
> Q:  Why?  And in answering that, would you first address it from the standpoint of academics?
> A:  South Dakota School for the Blind has multiple teachers of the visually impaired.  They have teachers that are certified duly in subject areas and in vision.  And that's critical.
>
> They have on-site, I believe – it's an ebb and flow, but about 40 students.  There are peers.  And it's so important for her to have peers that are non-sighted and peers.  Just peers.  She has no peers in Underwood.  She has—she needs to work with peers, and she's had difficulty in that area.
>
> She – she would have the opportunity to practice expanded core curriculum 24 hours a day, seven days a week.  It's there for her.  You can't learn this in isolation.  You can't go—what we're providing, four weeks last year, five weeks, and this year only one week, is not enough to teach her these areas that she—she needs help in.  She's eligible to get DD services for areas, and we're giving them to her one day a week.  They would be there.

Testimony of Mary Bormann, Tr. at 207-08.

Two employees of SDSB testified at the administrative hearing about the "many services that would benefit the plaintiff," (Testimony of Jodi Carlsgaard, Tr. at 643-668 and Testimony of Marjorie Kaiser, Tr. at 685-717), and exhibits in the record outline the services available at SDSB and the intent of its curriculum.  Exhibit 63.  Taking this evidence into account, ALJ Hoberg made the following finding:

> 6.   Not only did Christina fail in her burden of proof, but the District showed, by the greater weight of the evidence, that the SDSB was appropriate for Christina, under the circumstances.  This placement was supported by professionals from the District, from the NDSB, and from the SDSB.  It was not opposed by any of the professionals who testified at this hearing, only by Christina and her family.  Their reasons for opposition were not persuasive.  Even Christina's own expert essentially concluded that Christina needs more and different counseling and medication, that Christina needs more instruction and training, and more interaction on social skills, and that Christina needs a wide range of remediation in her education within a specialized educational placement.  Again, she is likely to get none, or not enough, of those things at the High School and most, if not all, at the SDSB.

Findings of Fact, Conclusions of Law, and Order, Doc. 1-3, at 14.

   Plaintiff further challenges the District's rationale for placing her at SDSB by arguing the District discriminated against her by considering only other low vision students as her "peers." However, the record is dense with testimony concerning Christina's interactions with other students, both sighted and non-sighted. The concerns raised by the District relate primarily to the extent of Christina's isolation at the high school and her social interaction skills. For example, Mary Bormann testified:

> Q: Can you talk about the interaction with peers in her academic courses?
> A: One of the things that's really difficult in this setting is the socialization. And Christina – Christina's limited in her socialization. She's currently only in two courses in which she's got peers, because she's dropped out of choir now, so she's in history and health with peers. And the other rest of the time she spends in the resource room.
>   She's in developmental English at her mother's request because her mother wanted her to not continue in English 11 with her peers because she had received a 70 score last -- a year ago, and her mom said she wasn't—she didn't want her to continue. So her mother wanted us to work on grammar; therefore, we had the independent study course.
>   She doesn't have any other outlets with peers. She goes to lunch, but tends to sit more by herself. She is in the school building, but she is not with kids.

Testimony of  Mary Bormann, Tr. at 170-71. The District expressed significant concern with Christina's lack of social interaction and isolation. One of Christina's math teachers testified:

> Q: Does Christina have friends at school?
> A: No. Socially, she's – does not really have friends at school. She eats lunch and breakfast kind of by herself and doesn't mingle with the kids.

Testimony of Kay Reiser, Tr. at 315. Sarita testified in accordance:

> Q: How many – how would you number her friends in Underwood today, in the school system? How many?
> A: I would – I don't think she has any.

Testimony of Sarita McComish, Tr. at 939.

Additionally, the IEP team members did not limit Christina's peer group to only non-

sighted students, but took into account the setting in which she had an opportunity to interact:

> Q:  Now, when you say her peers, do you mean only persons who have low vision
> or blindness?
> A:  Peers that have lower vision and blindness when she's in Grand Forks at the
> compensatory program.  Peers her own age, her classmates, when she's in
> Underwood.

Testimony of Dianne Giessinger, Tr. at 406.

Plaintiff's challenge to the District's allegedly discriminatory interpretation of "peers"

focuses primarily on a segment of the earlier quoted testimony of Mary Bormann about SDSB:

> There are peers.  And it's so important for her to have peers that are non-sighted
> and peers.  Just peers.  She has no peers in Underwood.  She has—she needs to
> work with peers, and she's had difficulty in that area.

Testimony of Mary Bormann, Tr. at 208.

While at first blush this statement could be construed as discriminatory and limiting

Christina's peer group to visually impaired students, when considered in context, the statement

clearly relates to Christina's social isolation and her need to interact with other students, whether

visually impaired or not.

Dr. Joseph Miller was specifically asked to consider whether placement at SDSB would

benefit Christina in the area of social interaction:

> Q:  Why is additional structure necessary, from your perspective?
> A:  From a first eval and with follow-up from subsequent evals, it was clear, first
> of all, that Christina is fairly socially isolated, that she doesn't have a lot of peer
> contact, and what contact she does have with peers is not particularly positive.  I
> think this is fairly crucial if she wants to operate independently, either in
> occupational settings or educational settings at the post secondary level.
> . . .
>
> Q:  So additional structure would appear appropriate?

A:  I think – I think, yeah, very appropriate.
Q:  Would a residential placement provide some of that additional structure?
A:  I think it would be – it would be consistent with an environment that provides
more structure.
. . .
Q:  Christina's proposed IEP is for a residential placement at the South Dakota
School for the Blind in Aberdeen, which would include multiple teachers of the
vision-impaired and daily expanded core curriculum involvement.  Would that be
consistent with her need for a more structured environment?
A:  Yeah, I think that would be consistent.

Dr. Joseph Miller Testimony, at 581, 583 and 585.

Taking this evidence into account, ALJ Hoberg made the following finding:

6.      Not only did Christina fail in her burden of proof, but the District showed,
        by the greater weight of the evidence, that the SDSB was appropriate for
        Christina, under the circumstances.  This placement was supported by
        professionals from the District, from the NDSB, and from the SDSB.  It
        was not opposed by any of the professionals who testified at this hearing,
        only by Christina and her family.  Their reasons for opposition were not
        persuasive.  Even Christina's own expert essentially concluded that
        Christina needs more and different counseling and medication, that
        Christina needs more instruction and training, and more interaction on
        social skills, and that Christina needs a wide range of remediation in her
        education within a specialized educational placement.  Again, she is likely
        to get none, or not enough, of those things at the High School and most, if
        not all, at the SDSB.

Findings of Fact, Conclusions of Law, and Order, Doc. 1-3 , at 14.  Based on this evidence, and

giving ALJ Hoberg's opinion "due weight," the court finds that Christina's 2005-2006 IEP does

not violate the IDEA.  The District appropriately decided to place Christina at SDSB, and that

placement provides the least restrictive environment available to ensure Christina receives the

maximum educational benefit.  Although the SDSB placement includes several less than ideal

factors, that placement is clearly superior overall to Underwood, the only other option available

at the time.  Because SDSB is the only available placement which could provide Christina with a

free appropriate public education, it also constitutes the least restrictive environment for

appropriate education.  Accordingly, the decision of Administrative Law Judge Allen Hoberg is

**AFFIRMED.**  Because Christina's 2005-2006 IEP does not violate the IDEA, plaintiff is not

entitled to compensatory education.

## ALJ Impartiality

Christina challenges the impartiality of ALJ Hoberg, in that he made statements "blaming

[her] and her parents for the District's failure to provide FAPE in the LRE."  Plaintiff's

Memorandum in Support of Plaintiff's Reply to Defendant's Motion for Summary Judgment,

Doc. 51, at 17.  Although the administrative record contains "evidence… show[ing] that the

plaintiff's parents contributed significantly to the circumstances the plaintiff suffered under the

2004-2005 IEP," Defendant's Memorandum in Support of Motion for Summary Judgment, Doc.

47, at 23, ALJ Hoberg's critical findings regarding FAPE and LRE do not improperly rest on

that evidence.  Plaintiff has failed to show ALJ Hoberg lacked impartiality.

## ADA and Rehabilitation Act Claims

Plaintiff has alleged in her complaint that the decision to segregate her from her peers in

Underwood and place her at SDSB violates the Americans with Disabilities Act (hereafter

"ADA") and Section 504 of the Rehabilitation Act (hereafter "Section 504").  The ADA

"prohibits qualified individuals with disabilities from being excluded from participation in or the

benefits of the services, programs, or activities of a public entity."  Randolph v. Rodgers, 170

F.3d 850, 857 (8th Cir. 1999)).  Likewise, Section 504 provides:  "no otherwise qualified

individual with a disability … shall … be excluded from the participation in, be denied the

benefits of, or be subjected to discrimination under any program or activity receiving Federal

financial assistance…."  29 U.S.C. § 794(a)(2000).  "The enforcement, remedies and rights are

the same under both Title II of the ADA and § 504 of the Rehabilitation Act."  <u>Birmingham v.</u>

<u>Omaha School District</u>, 220 F.3d 850, 856 (8th Cir. 2000).  When ADA and Section 504 claims

"are based on educational services for disabled children, the plaintiff must prove that school

officials acted in bad faith or with gross misjudgment."  <u>Id.</u>

Plaintiff has made no allegation of bad faith or gross misjudgment.  Thus, she has failed

to properly plead her ADA and Section 504 claims.  In any event, the evidence does not support

these claims.  ALJ Hoberg specifically concluded:

> <u>There has been no flagrant disregard</u> by the District in providing for educational
> services to Christina.  Indeed, the District has generally provided, certainly for the
> 2004-2005 school year, and, arguably for the 2005-2006 school year, most of the
> services that Christina has wanted, if not all of the services she has needed.  <u>There</u>
> <u>was certainly no bad faith on the part of the District.</u>  The District has made a
> good faith effort to provide FAPE to Christina.

<u>Findings of Fact, Conclusions of Law, and Order</u>, Doc. 1-3, at 18.

The court agrees with ALJ Hoberg's statements and finds no evidence in the record of

bad faith or gross misjudgment by the District.

## <u>Constitutional/Public Policy Claims</u>

Finally, plaintiff alleges violations of equal protection under the state and federal

Constitutions and violations of state and federal public policy.  The court finds no merit in these

claims.  The District complied with the IDEA and violated neither constitutional protections nor

public policy.

## <u>Conclusion</u>

The court finds that ALJ Hoberg properly concluded that Christina's 2005-2006 IEP does

not violate the IDEA.  Therefore, plaintiff's IDEA claim fails, and her other claims have no merit

as well.  Accordingly, defendant Underwood Public Schools Motion for Summary Judgment is

27

**GRANTED**, and plaintiff Christina McComish's Motion for Summary Judgment is **DENIED**.

Judgment will be entered dismissing plaintiff's complaint and cause of action.

  Dated this 6th day of March, 2008.

               */s/  Karen K. Klein*
               Karen K. Klein
               United States Magistrate Judge